**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**IN ADMIRALTY**

**MARK E. LUTHER, PHD.**

      **Plaintiff**,

**v.**

                                    **Case No.: 8:09-cv-2267-T35-TGW**

**M/V OURO DO BRASIL, Official Number**
**9832, her engines, tackle, appurtenances,**
**spares and equipment appertaining whether**
**onboard or not,** *in rem*, **FISCHER GROUP,**
**a Brazilian corporation,** *in personam*, **and**
**PROMENADE SHIPPING, a Liberian**
**corporation,** *in personam*

      **Defendants**.
_____

## FINAL JUDGMENT

      Plaintiff Mark Luther ("Plaintiff") brings this maritime tort action against

Defendants M/V Ouro Do Brasil ("ODB"), *in rem*, and Promenade Shipping, *in*

*personam* (collectively, the "Defendants")[1], for injuries suffered from an accident near

the Sunshine Skyway Bridge in Tampa, Florida on Monday, August 31, 2009.  Plaintiff

was performing maintenance on equipment located on top of the Northeast Dolphin

near the Sunshine Skyway Bridge at the time of the accident.  Plaintiff observed the

speed of the ODB as it proceeded under the Skyway Bridge and became concerned

about the level of wake it might create and descended from the Dolphin to the vessel.

Thereafter, the wake created by the ODB as it passed by the Dolphin rocked Plaintiff's

---

[1] The law suit was dismissed against Defendant FISCHER GROUP, without prejudice.
(Dkt. 29; Dkt. 30.)

vessel resulting in Plaintiff's being thrown from the boat, being pinned between the boat and the Dolphin, and eventually being thrown into the current, sustaining numerous permanent injuries. Plaintiff's vessel also sustained damage during the events. Plaintiff alleges that Defendants were negligent and caused the accident by failing to designate a proper lookout for the ODB, that the ODB's speed as dictated by the vessel's local pilot was unreasonable, and that the consequent wake created by the ODB was unreasonable. The Court held a five-day bench trial in this matter. The parties submitted evidence in the form of testimony, documentary evidence, and briefing. The Court, having evaluated the evidence presented at trial and having considered the testimony and demeanor of the parties and witnesses, makes the following findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).

## I.   FINDINGS OF FACT

1.   Plaintiff earned his B.S., M.S., and Ph.D. degrees in marine science from the University of North Carolina at Chapel Hill in 1976, 1978 and 1982, respectively. In 1990, Plaintiff became an Associate Professor at the University of South Florida ("USF") and, in 1995, he was granted tenure by the University.

2.   By 1999, Plaintiff, in addition to teaching, started a wholly-owned consulting business, Marine Science Associates, Inc. ("MSA"). Plaintiff is the sole shareholder and officer of MSA.

3.   A primary client of MSA is the Greater Tampa Bay Marine Advisory Council–PORTS, Inc. ("GTBMAC-PORTS"). GTBMAC-PORTS is a local consortium of maritime interests formed to handle the funding and management and operations of an

information system installed in Tampa Bay known as Tampa Bay Physical Oceanographic Real-Time System, often referred to simply as PORTS.

4.      PORTS is a public information acquisition and dissemination technology developed by the National Ocean Service (NOS).  PORTS includes the integration of real-time currents, water levels, winds, wave height, visibility, air and water temperatures, and barometric pressure at multiple locations with a data dissemination system.  The system transmits data to various users including the Tampa Bay Pilot Association ("TBPA").

5.      Measurements acquired by the system are sent by radio through Plaintiff's laboratory to the National Oceanic and Atmospheric Administration ("NOAA").  NOAA then distributes this information to the boating public.

6.      PORTS is managed, operated, and maintained by GTBMAC-PORTS under a cooperative agreement with NOS and USF.  There are at least eight data receiving and reporting PORTS stations around Tampa Bay, including a station near the Sunshine Skyway Bridge.

7.      As part of certain cooperative agreements between the University of South Florida and the Greater Tampa Bay Marine Counsel, Plaintiff is tasked with the repair, upkeep, maintenance and/or improvements of PORTS system equipment.  To perform this work, Plaintiff primarily used his thirty (30) foot vessel named the "Three Graces".

8.      When repairs, upkeep and/or maintenance to the PORTS system were needed, NOAA generally advised Plaintiff.  Plaintiff then assembled a small crew of 2-3 individuals (mainly graduate students or other faculty) to assist him on his mission.  On

the day of the accident, Plaintiff was servicing the PORTS equipment located on top of the Northeast Dolphin near the Sunshine Skyway Bridge in Tampa, Florida.

9.     Although the Dolphin carried a sign that read "security zone" advising boaters to keep away from the structure, it was Plaintiff's practice to moor his vessel to the Dolphin.  Both the U.S. Coast Guard and the TBPA knew and accepted Plaintiff's practice of mooring his vessel to the Dolphin to conduct the required tests.

10.     It was Plaintiff's routine practice, prior to leaving to service the PORTS system, to dispatch two types of notices: one for security and the other for safety.  The Security Notice was sent by fax to the United States Coast Guard and other law enforcement agencies.  The Safety Notice was sent by e-mail to certain relevant organizations and people to alert them when Plaintiff would be working on the PORTS system.

11.     Plaintiff included the TBPA, including Pilot John Wrasse ("Pilot Wrasse"), on his Safety Notice e-mails.  Plaintiff's Safety Notice e-mail distribution group is identified by its "PORTSL" identifier.

12.     Plaintiff's "PORTSL" e-mail distribution list as of August 31, 2009, included the valid e-mail addresses of Captain Allen L. Thompson, Jr. (Executive Director of Tampa Bay Pilots Association), Pilot Steven Cropper, Pilot Jorge Viso ("Pilot Viso"), Pilot Wrasse, as well as personnel from NOAA, the Port of Tampa, the Cooperative Vessel Traffic Service ("CVTS"), the United States Coast Guard, and individuals who worked in Plaintiff's lab.

13.     Pilot Wrasse, the pilot who, as explained below, would be designated by random assignment to pilot the ODB on Monday, August 31, 2009, conceded he always

received Plaintiff's Safety Notices by e-mail and that this method of receiving notices by e-mail was in place in August 2009 when Plaintiff was injured in the accident.

14.     The Safety Notices, sent via e-mail, were always well-received by the recipients, including the TBPA and Pilot Wrasse.  Plaintiff was never told that his Safety Notices were inadequate or less than sufficient in any way by any of the recipients.  In fact, the pilots and other recipients of the Safety Notices sometimes responded to Plaintiff's Safety Notices to confirm that they saw him in the area or to discuss issues relating to his maintenance of the PORTS system.

15.     From January 2003 until August 31, 2009, Plaintiff sent a total of two hundred thirteen (213) Safety Notices via e-mail, and the TBPA was always included by Plaintiff as a recipient.  Forty two (42) of these Safety Notice e-mails referred to operations at the Sunshine Skyway Bridge's Northeast Dolphin site.

16.     Plaintiff performed operations at the Sunshine Skyway Bridge Northeast Dolphin site between 40 to 50 times between January 2003 and August 31, 2009 and sent as many Safety Notices by e-mail during that time span.

17.     At 6:14 p.m. EDT on Monday, August 24, 2009, NOAA notified Plaintiff that the PORTS current measurement system at the Sunshine Skyway Bridge (atop the Northeast Dolphin) stopped transmitting data.  On Tuesday, August 25, 2009, at 8:03 a.m., Plaintiff confirmed, by e-mail, to NOAA that he would schedule a visit to the site for Thursday August 27, 2009.

18.     On Wednesday, August 26, 2009, Plaintiff followed his customary practice of sending a Safety Notice by e-mail to various parties advising that he would be

performing work on the Northeast Dolphin.  Plaintiff's August 26, 2009 Safety Notice was sent to various members of the TBPA, including Pilot Wrasse and Pilot Viso.

19.     Plaintiff's August 26, 2009 e-mail stated:

> Please forward to others as appropriate.  We will conduct maintenance operations at the Sunshine Skyway Bridge at our current measuring site tomorrow, [Thursday] 27 August 2009.  These operations will be performed beginning at approximately 11:00 and ending no later than 15:00. TBPORTS personnel will perform work on the protective dolphin to the northeast of the bridge center span.  No work will be performed under the bridge.  Operations will be performed from a 30 ft pilot vessel, "Three Graces," registration # FL9032NJ, with blue hall, white cabin and decks, and NOAA markings, flying an orange FDOT flag #D765.  There will be 4 persons aboard the vessel.  These operations are required to perform repairs on the current measuring system.  Please call me at 727-410-2838 if you have any questions or concerns.

20.     On Thursday, August 27, 2009, because of inclement weather, Plaintiff rescheduled the plan.  Accordingly, Plaintiff sent another Safety Notice e-mail to the "PORTSL" e-mail distribution list, on Friday, August 28, 2009, at 8:22 a.m., explaining: "[w]e were unable to visit the Skyway Bridge site yesterday due to weather. We will attempt another visit on Monday (8/31/09).  Required notification forms will be sent via Fax."  Among those who received this e-mail was Pilot Wrasse.  Another recipient of the e-mail was Pilot Viso, who forwarded Plaintiff's Friday August 28, 2009 Safety Notice moments later to each individual pilot in the TBPA, including Pilot Wrasse.

21.     On the morning of the day of the accident, Monday, August 31, 2009, at 8:31 a.m., Plaintiff sent another Safety Notice by e-mail to the PORTSL e-mail distribution list.  The notice stated as follows:

> Please forward to others as appropriate.  We will conduct maintenance operations at the Sunshine Skyway Bridge at our current measuring site today, 31 August 2009.  These operations will be performed beginning at approximately 10:00 and ending no later

than 14:00.  TBPORTS personnel will perform work on the protective dolphin to the northeast of the bridge center span.  No work will be performed under the bridge.  Operations will be performed from a 30 ft pilot vessel, "Three Graces," registration # FL9032NJ, with blue hull, white cabin and decks, and NOAA markings, flying an orange FDOT flag #D765.  There will be 4 persons aboard the vessel. These operations are required to perform repairs on the current measuring system.  Please call me at 727-410-2838 if you have any questions or concerns.  Required notification forms have been sent via fax.

22.    Plaintiff also sent the required Security Notice, called the *United States Coast Guard Notification Form to be used by all Consultants/Contractors for all Waterborne Work,* via fax to all required entities between 7:23-7:29 a.m. that same morning.

23.    Plaintiff set out for the Northeast Dolphin on his 30 ft. vessel, the "Three Graces," around 9:30 a.m. on August 31, 2009, with two crew members, Jeff Scudder ("Mr. Scudder") and Heather Havens ("Ms. Havens").   The weather conditions were clear and sunny, very light wind and calm seas.

24.    Plaintiff, Mr. Scudder, and Ms. Havens arrived at the Northeast Dolphin around 10:30 a.m.   Plaintiff moored the Three Graces to the southwest side of the Northeast Dolphin.   Plaintiff and his crew secured the Three Graces to the wooden boards attached to and surrounding the cylindrical concrete Dolphin structure. Throughout the operation, Plaintiff displayed upon the Three Graces a large day-glow orange Florida Department of Transportation flag and white NOAA PORTS "dodger" flag so that the vessel could be seen by passing traffic.

25.    The dock lines at the bow and stern of the Three Graces were looped around the wooden fender boards of the Northeast Dolphin structure and tied off on the Three Graces by using the mooring cleats at the bow and stern of the vessel.  In this

manner, the Three Graces was close enough to the structure to allow Plaintiff and his crew to get on and off the Dolphin by using a Jacobs Ladder.

26.     The Three Graces was minimally cushioned from contact with the fender boards by nine cylindrical rubber fenders suspended along the hull and two spherical rubber fenders suspended along the side of the pilot house.

27.     The location where the Three Graces was tied up is a U.S. Coast Guard security zone.  However, as noted, by custom and practice, Plaintiff was not precluded from tying up to the structure.

28.     The ODB is a 564 foot refrigeration cargo vessel that was laden with 27,967,820.15 pounds of orange juice at the time of the accident.  Her draft was at 29 feet, 10 inches.

29.     Upon entry into piloted waters, at 9:45 a.m. on August 31, 2009, the Captain of the ODB, Klaus-Dieter Drews ("Captain Drews"), radioed the Tampa Bay Pilot's station to request a pilot.

30.     Pilot assignments are determined each day by a random drawing which Pilot Wrasse describes as establishing a "batting order" or a "batting line up."  It was by this procedure that Pilot Wrasse was randomly assigned to pilot the ODB on the day of the accident.

31.     Pilot Wrasse testified that when he is needed to pilot a vessel, he provides the dispatcher instructions to give him a wake-up call one hour before he needs to be on the pilot boat.  He allows himself 15 minutes to get out of bed and get dressed before he leaves his house.

32.     Although he had internet access at home and at least one computer capable of accessing the internet, Pilot Wrasse did not check his e-mail before leaving his house on the morning of the accident.   Pilot Wrasse testified that he does not usually check his e-mails on a daily basis and that there was not enough time for him to check his e-mail on the morning of the accident.

33.     The drive from his house to the location of the pilot vessel (the ODB) was forty-five (45) minutes.   At 10:24 a.m. Pilot Wrasse boarded the ODB and proceeded to the bridge of the vessel.   Pilot Wrasse was a compulsory pilot

34.     Pilot Wrasse admitted that he received Plaintiff's Safety Notice e-mails of Wednesday August 26, 2009 and the two (one from Plaintiff directly and the same one again from Pilot Viso) sent on Friday, August 28, 2009.   Pilot Wrasse testified that he did not open the e-mail sent to him on Monday morning, the day of the accident, until after he had left his piloting job for the ODB and returned home.   Thus, the last information he received concerning Plaintiff's plans was that Plaintiff would be out at the Northeast Dolphin on Monday, August 31, 2009, weather permitting.   Pristine weather conditions presented on the day of the accident.   It appears that in the press of time and with the excitement of piloting the ODB, Pilot Wrasse simply forgot that Plaintiff would be at the Dolphin.

35.     Pilot Wrasse boarded the ODB at 10:26 a.m.   Pilot Wrasse compared the ODB to a Corvette because of its "sleek" quality and ability to travel at extremely high rates of speed relative to other more cumbersome and lumbering vessels.   Upon boarding this 15,218 gross tons seagoing "Corvette," and without regard to the knowledge he constructively possessed of the likely presence of the Three Graces in

the channel, Pilot Wrasse immediately directed Captain Drews to "go maximum" and increased the vessel's speed in the ship channel to maximum sea speed.  At maximum sea speed, the vessel was operating at a speed of approximately 16.1 knots at the point that it passed Plaintiff's vessel and the Northeast Dolphin.

36.     Dispatcher Amy Newell testified that most vessels travel at 10 to 12 knots in the channel, although some travel at lower speeds and some travel at higher. Captain Drews testified that operating the vessel at full maneuvering speed, around 12 to 13 knots, would have allowed them to quickly handle and/or slow the vessel should an emergency present itself.  Although there is nothing inherently wrong or dangerous about traveling at high rates of speed on the open waters, at 16.1 knots the vessel could not be corrected or slowed quickly and strategically to address the unexpected.

37.     Pilot Viso testified that generally, the higher the speed of the vessel and the deeper the draft, the larger the wake created by the vessel.  Pilot Viso and Pilot Wrasse testified that 16.1 knots is an acceptable and appropriate speed for a vessel like the ODB to travel while approaching the Sunshine Skyway Bridge in circumstances like the day of the accident where the weather was clear and there was no heavy traffic in the area.   Pilot Wrasse testified that he routinely brought ships, similar to the ODB, into Tampa Bay at an average speed of 16 to 17 knots.

38.     Captain Drews and two other crew members were on the bridge of the ODB when Pilot Wrasse boarded the ship.  At around 11:00 a.m., approximately 13 minutes before passing underneath the Sunshine Skyway Bridge, the two crew members, who had been involved in maintaining the dedicated lookout duties, were removed from the bridge and assigned to "maneuvering duties," like fastening the

tugboats as they prepared to enter the channel.  Captain Drews assumed lookout duties at that point.  In addition to being a lookout, however, Captain Drews also had the duty of handling the engine of the ship.

39.     Pilot Wrasse did not advise Captain Drews of any navigational advisories and gave him no warning of local risks on the day of the accident.  Captain Drews did not have knowledge of the equipment on top of the Dolphin or of the Dolphin's location. Captain Drews did not know Plaintiff would be at the Northeast Dolphin or that the Three Graces would be tied to the Dolphin because Pilot Wrasse never informed him of that fact.

40.     Captain Drews and Pilot Wrasse never saw the Three Graces before or during the time the ODB passed the Three Graces and the Northeast Dolphin.

41.     Captain Drews testified that if he had known the Three Graces was there, he would have seen the vessel because he would have known to be looking for it specifically.

42.     Pilot Wrasse and Pilot Viso both testified that when Plaintiff was out working on the Dolphin in the past, the pilots were aware of his presence and traveled at slower speeds through the channel so they would not create any dangerous wakes when passing.

43.     A presentation offered by the Defendants' expert, Pilot Viso, showed that as the ODB made its transit towards the Sunshine Skyway Bridge, the Northeast Dolphin was hidden behind a rip-rap (a high piling of rocks) so that Plaintiff's vessel was not visible to anyone on the ship, with or without binoculars, until the ODB was about one-third (1/3) of a mile from the Sunshine Skyway Bridge.

44. Even if Captain Drews had nevertheless seen Plaintiff on the Dolphin by the time Plaintiff became visible, because of the speed of the ODB as directed by Pilot Wrasse, there would not have been enough time to make adjustments that would have changed the size of the wake that caused this accident. Additionally, Captain Drews would not have been able to safely initiate a crash stop at that point[2].

45. Plaintiff first noticed the ODB when it passed the north end of Egmont Key, about 6 miles out from the Northeast Dolphin. At that time, Plaintiff was on top of the Northeast Dolphin. At approximately 11:13 a.m., the ODB passed beneath the Skyway Bridge travelling at a speed of approximately 16.1 knots.

46. At approximately the time that the ODB reached the Skyway Bridge, Plaintiff decided to leave the Northeast Dolphin and board his boat after he saw the initial approaching bow wake of the ODB. Plaintiff estimated this wake to be significant, but not as significant as he would soon discover the following wakes produced by the stern of the vessel would be. Because of the placement of the Jacob's ladder used by him and his crew to access the Dolphin, Plaintiff climbed down the ladder to the roof of the Three Graces rather than the deck of the vessel.

47. Once on the roof of the Three Graces, Plaintiff turned toward the direction that the ODB had traversed and saw a second set of larger oncoming wakes, prompting Plaintiff to exclaim "we're f_ _ _ _ _." Plaintiff did not appreciate the size of the second wakes until after he descended to the roof of the Three Graces. In the ensuing calamitous seconds, Plaintiff proceeded to try to protect the boat from the oncoming

---

[2] A line graph introduced by Plaintiff's expert, taken to its logical conclusion, projects a catastrophic crash stop scenario that would have resulted in even greater damage than that caused to the Three Graces. The Court rejects the suggestion that that would have been a viable option.

wake by fending off the boat from the Dolphin.  Plaintiff was on the roof of the boat with outstretched arms preparing to attempt to push against the wood on the Dolphin to reduce the turbulence to the boat.

48.     Plaintiff was on the starboard side of the vessel close to the Dolphin at that time.

49.     Within 45 seconds of Plaintiff's uttering his expletive, the second wake hit the boat causing the boat to rock against the Dolphin.  Plaintiff, who was on the roof of the boat, began to lose his balance, lost his footing and fell to the port side of the Three Graces.  Then a third wake hit the boat sending Plaintiff from the port side of the vessel back to starboard side.

50.     The edge of the cabin of the boat pinned Plaintiff against the fender boards of the Dolphin, and, as the boat rocked back in the other direction, Plaintiff fell into the water.

51.     The wakes that hit the vessel were at least four feet high and were the disturbance that caused the calamity in question.   No evidence of other weather conditions or traffic in the area that could have caused the wakes or the ensuing injury was offered at trial.

52.     Plaintiff fought his way to the surface and called out to Ms. Havens for help.  Ms. Havens was able to hold Plaintiff against the swim platform of the Three Graces.  Mr. Scudder climbed down and held Plaintiff while Ms. Havens called 911.  Mr. Scudder and Ms. Havens were able to pull/push Plaintiff from the water and lay him across the swim platform between the Three Graces transom and the outboard engines to await emergency rescue personnel.  Plaintiff was bleeding profusely from a gaping

chest wound near his left arm pit with exposed muscle, tissue and ribs; he had great difficulty breathing.

53.     Ms. Havens applied pressure to Plaintiff's chest wound to slow the bleeding.  At 11:16 a.m. the ODB passed the Northeast Dolphin. The Eckerd College Search and Rescue team members were the first responders to the distress call of the Three Graces.  By 11:36 a.m. they arrived on scene at the Northeast Dolphin piling. Shortly thereafter, at 11:43 a.m. St. Petersburg Fire-Rescue boat arrived.   St. Petersburg Fire-Rescue transferred Plaintiff to its boat on a back-board.  Fire-Rescue transported Plaintiff to shore where he was taken by ambulance to Bayfront Medical Center with multiple injuries.  The ODB was completely oblivious to the damage and injury her wake had caused.

54.     Plaintiff was in surgery for approximately eight (8) to nine (9) hours and remained in the intensive care unit for 6 days.    Plaintiff remained in the hospital for twenty-five (25) days.  Plaintiff's injuries included a left scapula fracture, dislocated clavicle, a flail chest with a hemopneumothorax (the lung was collapsed in the chest cavity and that there was blood and air around the lung), multiple rib fractures on both sides of the chest, damage to chest muscles, severed left axillary artery, and torn left brachial plexus nerve bundle.

55.     A vein was grafted from Plaintiff's left thigh to repair the damaged axillary artery.  Plaintiff underwent major shoulder reconstruction and still suffers from constant pain and stiffness in the shoulder.   Plaintiff no longer has any functional use of his left upper extremity.  Physical therapy was used to restore adequate blood flow circulation to his dangling arm.  The outer skin of his left side is numb and neuropathy in the left

hand persists.  Plaintiff's upper left rib cage is also permanently disfigured, with a large, visible dent or crease in the chest wall.

## II.   CONCLUSIONS OF LAW

The ODB is liable, *in rem*, for any negligence of Pilot Wrasse and for any negligence of Captain Drews.  See Tampa Port Authority v. M/V Duchess, 65 F.Supp.2d 1279, 1291 (M.D. Fla. 1997); Amoco v. M/V Montclair, 766 F.2d 473, 476 (11th Cir. 1985).  However, Promenade Shipping is only liable, *in personam,* for any negligence of its crew and master Captain Drews because the owner of a vessel is not liable for the negligence of a compulsory pilot.  See Tampa Port Authority, 65 F.Supp.2d at 1292 ("the negligence of [a compulsory pilot], while imputed to the vessel, may not be imputed to the vessel's owner, captain, or crew absent evidence of negligence on their part [...] [t]he master of a vessel with a compulsory pilot is entitled to assume that the pilot is an expert on local conditions and practices, until it becomes manifest that the pilot is steering the vessel into danger"); see also Homer v. Ramsdell, 182 U.S. 406 (1901).

General negligence principles apply in admiralty cases.  See Morris v. Paradise of Port Richey, Inc., 2009 U.S. Dist. Lexis 38706 at *5 (M.D. Fla. 2009).  Liability in a maritime negligence action is distributed among the parties according to each party's comparative degree of fault.  See United States v. Reliable Transfer, 421 U.S. 397 (1975); Great Lakes Dredge Co., v. Miller, 957 F.2d 1575, 1579 (11th Cir. 1992).

For the reasons stated below, the Court finds that Defendant ODB is fully liable, *in rem*, for the property damage to the Three Graces caused by the negligence of Pilot Wrasse.  The Court also finds that Defendant ODB is fully liable for Plaintiff's personal

injuries. However, the Court finds that Promenade Shipping is not liable for any of Plaintiff's damages.

## A.    Liability for Property Damage to Three Graces

Plaintiff alleges that his vessel the Three Graces suffered property damage as a result of the wake generated by the ODB. Whether a vessel is responsible for damage created by her swells depends upon the facts and circumstances of each case. See Moran v. The Georgie May, 164 F.Supp. 881, 884 (S.D. Fla. 1958). The Court in Moran stated:

> [a] vessel causing injury to others by her swell must be held responsible for any failure to appreciate the reasonable effect of her own speed and motion through the water at the particular place and under the particular circumstances where the injury occurred, and her officers are required to take into consideration others who may reasonably be expected to be affected, and to take all reasonable precautions to avoid their injury even though former experience has shown that in the ordinary and usual course of events they are likely to escape injury or that the larger vessel was proceeding on ordinary course and at her customary speed.

Id. Where the master of one vessel has timely notice of the presence of another properly moored vessel, it is his "obligation to see to it that his vessel does not pass at such speed that danger would result from her suction or swells and he is responsible for their effects upon innocent vessels." West India Fruit & S.S. Co. v. Rayomd, 190 F.2d 673, 674 (5th Cir. 1951).

### 1.    Pilot Wrasse

Pilot Wrasse had a duty to operate the ship at a speed that, in light of the circumstances presented at the time, did not pose a danger to vessels near its path. In this case, the evidence establishes that Plaintiff had moored his vessel more than 40 times at the exact same location to service the essential system on top of the Northeast

Dolphin.  The TBPA, including Pilot Wrasse, as well as the U.S. Coast Guard were all aware of the fact that Plaintiff routinely moored his vessel there.  There is no evidence on the record showing that Plaintiff had ever been reprimanded or corrected in the past by anyone, including the U.S. Coast Guard, for the numerous times he had moored his vessel to the Dolphin.  It appears that it was an accepted practice among all parties involved, including the TBPA and the U.S. Coast Guard, for Plaintiff to moor his vessel to the Dolphin.  Thus, the signs instructing the general public to keep away from the Dolphin were, by custom and practice, not applicable to Plaintiff and it was not illegal for Plaintiff to tie his vessel to the Dolphin.  Further, the fact that Plaintiff could have used a different tying methodology to moor the Three Graces, and the fact that Plaintiff could have positioned the Three Graces on the northeast side rather than the southwest side of the Dolphin, as suggested by Defendants, is just evidence of another alternative.  It does not establish that the method chosen by Plaintiff was improper or negligent.  Thus, the Court finds that Plaintiff's vessel was properly moored at the time of the accident.

Prior to the time of the accident, Plaintiff sent three (3) e-mails notifying Defendants of his intention to service the system on top of the Northeast Dolphin.  Pilot Wrasse conceded that he received Plaintiff's Wednesday, August 26, 2009 e-mail as well as the Friday, August 28, 2009 e-mail.  Pilot Wrasse testified that if he had known Plaintiff's vessel was moored at the Northeast Dolphin, he would have proceeded at a slower speed, as many of the pilots have done in the past when notified that Plaintiff would be working at the Northeast Dolphin, to avoid creating any dangerous wakes.  Having multiple notices as of Friday, August 28, 2009 that Plaintiff planned to be at the Northeast Dolphin if weather permitted, and seeing that the clear weather did permit,

Pilot Wrasse knew or should have known that Plaintiff would be working at the Northeast Dolphin on the morning of the accident. By the Defendants' own admission and the testimony of the Defendants' expert, the ODB should have been traveling at slower speeds to permit adjustment if necessary and to reduce the size of the wake of the vessel. Thus, the Court finds that, under these circumstances, Pilot Wrasse, upon boarding the ODB, acted unreasonably by giving the order to go maximum and by operating the vessel at the speed of 16.1 knots while passing the Northeast Dolphin. The Court also finds that, as a result of travelling at an unreasonable speed, the ODB created the unreasonable wake that resulted in turbulence to the Three Graces, pushing it into the wooden piling of the Dolphin and causing damage to the Three Graces. Therefore, the ODB is fully liable, *in rem*, for the property damage to the Three Graces.

### 2.    Captain Drews

Captain Drews had a duty to ensure that the ODB maintained a proper look-out. However, because Pilot Wrasse was a compulsory pilot, Captain Drews had no duty to interfere with Pilot Wrasse's operation of the vessel unless it became manifest that Pilot Wrasse was steering the vessel into danger. See Tampa Port Authority at 1292. The Court finds that under the circumstances of this case, it was not clearly manifested to Captain Drews that Pilot Wrasse was steering the ODB into danger. Thus, Captain Drews had no duty to intervene with Pilot Wrasse's operation of the vessel.

In this case, the Court need not decide whether Captain Drews maintained a proper look-out because even if Captain Drews had maintained a proper look-out, the Court finds the accident could not have been prevented after Pilot Wrasse boarded the vessel and gave the signal to go maximum. First, Captain Drews never had notice that

Plaintiff would be working on the Northeast Dolphin because Pilot Wrasse never warned him of that fact.  The Court finds that, with no prior notice or warning that Plaintiff would be at the Northeast Dolphin, Captain Drews could not have seen Plaintiff's vessel even if he maintained a proper look-out. The evidence demonstrates that as the ODB made its transit towards the Sunshine Skyway Bridge, the Northeast Dolphin was hidden behind a rip-rap.  Plaintiff's vessel was further obscured by the Dolphin and the rip-rap so that unless someone was specifically looking for the Three Graces or her crew atop the Dolphin, they would not have been detectable, with or without binoculars, until the ODB was about one-third of a mile from the Sunshine Skyway Bridge.  The evidence fails to establish that Captain Drews could have or reasonably should have detected the presence of the Three Graces or her crew.  Further, even if Captain Drews had seen Plaintiff on the Dolphin, at the point at which Plaintiff was visible there would not have been enough time to make adjustments that would have changed the size of the wake.

Plaintiff's expert, Captain Eugene Hickey, testified that the Three Graces should have been visible to the ODB at least 7/10ths of a mile from the Dolphin and that the people on the Dolphin would have been visible even further away.  The Court did not find Captain Hickey's testimony credible.  Captain Hickey's testimony is based upon his reviewing an attempted simulation of the transit of the ODB towards the Sunshine Skyway Bridge via a video taken from the vantage point of a helicopter.  There is no evidence on the record from which the Court can ascertain: 1) the ratio of the zoom lens of the camera used to shoot that video; 2) the altitude the helicopter maintained during the flight, or 3) what speed the helicopter maintained during the flight.

Further, Captain Hickey, using a line graph diagram, also testified that upon seeing Plaintiff from 7/10ths of a mile away while approaching the Sunshine Skyway Bridge, Defendants could have initiated a crash stop of the vessel which would have slowed the vessel down to a manageable level.  The Court did not find this testimony credible because the line graph of Plaintiff's expert, taken to its logical conclusion, projects a crash stop scenario that would have resulted in even greater damage, possibly to life and certainly to property, than that caused to the Three Graces.

Additionally, Captain Drews had no duty to interfere with Pilot Wrasse's operation of the vessel on the morning of the accident.  Pilot Viso and Pilot Wrasse testified that with no knowledge of the presence of Plaintiff or the Three Graces, 16.1 knots was an acceptable and appropriate speed for a vessel like the ODB to travel while approaching the Sunshine Skyway Bridge in the circumstances presented on the day of the accident where the weather was clear and there was no heavy traffic in the area.  Pilot Wrasse testified that he routinely brought ships, similar to the ODB, into Tampa Bay at an average speed of 16 to 17 knots.  Thus, Captain Drews, having no prior notice of Plaintiff's presence at the Northeast Dolphin could not have seen the Plaintiff or his vessel until it was too late to adjust the course and speed of the ODB.  Captain Drews had no reason to believe that operating the vessel at 16.1 knots was dangerous on the morning of the accident and therefore had no duty to ensure that Pilot Wrasse operated the vessel with more caution. Likewise, the Court finds that Captain Drews' service as the look-out was not the cause of the accident or the resulting damage or injury. Therefore, Defendant Promenade Shipping is not liable, *in personam*, for any damages in this case.

**B.      Liability for Dr. Luther's Personal Injuries**

Plaintiff argues that he sustained personal injuries as a result of the wakes generated by the ODB and that Defendants are liable for his injuries.   Defendants contend that Plaintiff was negligent and caused his personal injuries by coming down to the roof of the vessel rather than staying on top of the Dolphin and by standing on the roof of the vessel rather than descending to the deck of the vessel or climbing back up the ladder once he noticed the size of the second wake.   That is to say, Defendants contend even if Plaintiff could prove they were negligent in causing the wake, Plaintiff's negligence—not their negligence—was the proximate cause of Plaintiff's injuries. The Court disagrees.

In order to constitute the proximate cause of a plaintiff's injury, the defendant's breach must be a substantial factor in bringing about the harm.      See Cornish v. Renaissance Hotel Operating Company, WSRH VSP, LP., 2007 WL 4614776 (M.D.Fla. 2007).   "The issue of proximate causation is generally a question of fact concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred."   Id. (citing Goldberg v. Fla. Power & Light Co., 899 So. 2d 1105, 1116 (Fla. 2005)).   The  Court  finds  that  Pilot  Wrasse's negligence in this case foreseeably and substantially caused Plaintiff's injuries and was therefore the proximate cause of Plaintiff's injuries.

Further, Defendants failed to prove that Plaintiff was comparatively negligent. The burden of proving comparative negligence falls on the Defendant.   See Wallent v. Florida Power Corp., 852 So.2d 339, 340 (Fla. 2nd DCA 2003).   In order to establish the defense of comparative negligence, Defendants must prove each of the elements of

negligence—that Plaintiff breached a duty of care, and that the breach was the proximate cause of Plaintiff's injuries.  See Borenstein v. Raskin, 401 So.2d 884, 886 (Fla. 3d DCA 1981).  Initially, the Court finds that Plaintiff was not negligent for descending to the roof of the vessel because Defendants did not prove that Plaintiff could have appreciated the size of the second wake until he was on top of the boat. Defendants essentially contend Plaintiff should have selected one of two other options available to him once he was able to appreciate the size of the second oncoming wake: (1) descend to the deck of the vessel, or (2) climb back up the ladder towards the top of the Dolphin.  Defendants argue that Plaintiff's decision to remain standing on the roof of the boat, rather than descend to the deck or climb back up the ladder, was negligent. The evidence on the record is insufficient to allow the Court to find that any one of the two proposed options suggested by Defendants as being available to the Plaintiff once he realized the size of the second oncoming wake was in fact more prudent or even available.

First, the evidence demonstrates that Plaintiff had at most 45 seconds to scramble his way to the deck of the vessel once he realized the size of the oncoming wake.  There is no evidence on the record showing that this was sufficient time for Plaintiff to make it down safely to the deck of the boat considering the circumstances he faced.  There is likewise no evidence of record to show that once he lay prone on the roof to try to scamper down to the deck, as Defendant apparently suggests he should have, that he would have reached the deck and would not have been thrown overboard by the turbulence as he eventually was.  Second, there is no evidence on the record to prove that Plaintiff would have successfully reached the ladder and made it back to the

top of the Dolphin safely within the short amount of time available to him.  Again, in the press of the circumstances, it is equally likely that Plaintiff could just as easily have lost his footing steeping up onto one foot to attempt to scale the rope ladder to the top of the concrete piling.  Thus, Defendants have failed to prove that Plaintiff's decision to remain on the roof, however precarious, rather than descend to the deck or climb back up the ladder, was negligent.  Defendants have also failed to prove that Plaintiff's injuries would have been prevented had Plaintiff attempted to descend to the deck of the vessel or climb up the ladder back to the Dolphin.  Moreover, it is uncontroverted that without the wake caused by the ODB, Plaintiff would not have fallen overboard and would not have been injured as he was.  Accordingly, Defendants are fully liable for Plaintiff's personal injuries.

## C.     Damages

### 1.     Property Damage to the Three Graces

The Court finds that due to the accident, the Three Graces sustained damage to its starboard bow and rail.  The Three Graces also sustained damage to its starboard cockpit window. The Court finds that Plaintiff paid a total of $16,816.83 to repair these damages.  The Court also finds that Plaintiff paid a total of $1,051.32 in expenses associated with towing the vessel.  With regards to Plaintiff's demand for damages for repair costs to the trailer on which the boat sat and for the routine servicing of the Three Graces' engine, there is no evidence on the record that such damages were caused by the Defendants' negligence.  Therefore, Plaintiff is awarded $17,868.15 in total damages for the property damage to the Three Graces.

## 2.    Lost Wages and Lost Profits

Damages for lost wages and lost profits must be established with reasonable certainty.  See Benjamin v. Diel, 831 So. 2d 1227, 1229 (Fla. 4th DCA 2002); see also Hale Container Line, Inc. v. Houston Sea Packing, Co., Inc., 137 F.3d 1455, 1474 (11th Cir. 1998) ("under general maritime law, damages for lost profits against a tortfeasor are allowed only when the amount of such profits is proven with reasonable certainty.")

### USF

The Court finds that Plaintiff suffered no loss of past USF wages as a result of the accident.  Plaintiff's tax returns for the five years prior to the accident (2004-2008) show Plaintiff's USF Social Security Wages to be $77,683, $83,524, $89,296, $93,130, and $45,497, respectively.  Plaintiff's Social Security Wages from USF in 2009 and 2010 were $85,702 and $85,209, respectively.  Plaintiff received his full USF salaries in 2009 and 2010.  Plaintiff's tax records showed no loss in his USF wages following the accident.  Therefore, the Court awards Plaintiff $0 in past lost income for his USF wages.

Further, the Court finds that Plaintiff failed to establish with reasonable certainty any loss of future wages from USF.  Plaintiff contends that he will not be promoted to full professorship as a result of the accident and will therefore forfeit an increase in salary.  The Court finds this claim to be speculative.  The determination of full professorship is based on a number of factors, including sufficient publications, speaking engagements, and obtaining research grants.  Further, Plaintiff applied for full professorship before the accident and was advised by the Dean to withdraw his application for lack of sufficient publications.  Plaintiff is still able to conduct research

and publish and may still be promoted to full professorship.  The Court is mindful of the limitations Plaintiff might face with regards to traveling and self-care needs; however, there is no evidence that Plaintiff will not be promoted to full professorship as a result of these limitations or that any failure to be promoted would be proximately caused by the accident and resulting injuries.  The Court also finds Plaintiff's testimony that he will no longer be able to secure grants to pay for his summer salary to be speculative.  Therefore, the Court awards Plaintiff $0 for future lost wages in USF salary.

## MSA

Plaintiff fails to provide enough evidence to allow the Court to discern, with a reasonable degree of certainty, Plaintiff's loss of profits from MSA.  Plaintiff committed to USF, pursuant to his "outside activities" reports, that he would devote an average of eight (8) hours per week on MSA related work.  However, with the exception of two post-accident MSA statements, there is no evidence on the record as to the actual number of hours per month Plaintiff expended on MSA work before and after the accident.  There is also no evidence on the record reflecting a decline in the number of hours Plaintiff expended on MSA work as a result of the accident.    The two post-accident statements show that Plaintiff performed twenty-six (26) hours of work for MSA in November of 2009, merely two months after the accident, and 33 hours of MSA work in March of 2010.

A review of MSA's tax records reveals a net profit per books of $8,926 for 2007 and $18,362 in 2008.  From 2009 through 2011, MSA reported net profit per books of $21,087, $12,623, and $9,505, respectively.  There is no evidence on this record to suggest that any decline in net profits from 2009 to 2011 was due to a decline in hours

expended on MSA work by Plaintiff because of the accident.   Thus, the evidence is insufficient to allow the Court to conclude that Plaintiff experienced any loss profit from MSA as a result of the accident.   Therefore, the Court awards Plaintiff $0 in past and future loss income for MSA.

### 3.    Pain and suffering

After careful consideration of the evidence presented at trial, the Court finds that an appropriate award for Plaintiff's past and future pain and suffering is $1,000,000.00. Plaintiff, a professor and writer, an avid boater and outdoorsman, father of two children and husband of 23 years, suffered horrendous injuries, underwent painful surgeries and resulting recuperation.   He has completely and permanently lost the use of his arm.   His body has been badly disfigured, causing both physical and emotional pain and suffering.     The Court finds, therefore, that the above-referenced sum is an appropriate amount to compensate Plaintiff for these losses.

### 4.    Past Medical Expenses

The plaintiff in a personal injury suit has the burden of proving the reasonableness and necessity of medical expenses.   See Albertson's, Inc., v. Brady, 475 So. 2d 986, 988 (Fla. 2nd DCA 1985).   Expert testimony is not required in order to admit medical expenses into evidence.   Id. (citing Garrett v. Morris kirscman & Co., 336 So. 2d 566 (Fla. 1976)).   A plaintiff's own testimony may adequately establish the reasonableness and necessity of medical expenses if the plaintiff provides a "detailed description of the treatment procedures that clearly relates the treatment to the accident" and introduce the medical bills into evidence. Id. (citing Easton v. Bradford, 390 So. 2d 102 (Fla. 2nd DCA 1980)); East West Karate Association, Inc. v. Riquelme,

638 So.2d 604, 605 (Fla. 4th DCA 1994).    In this case, Plaintiff testified that he underwent surgery for approximately nine (9) hours following the accident.   Plaintiff testified that he was in the hospital for twenty-five (25) days and underwent a second surgery while in the hospital.    Plaintiff testified that he had a major shoulder reconstruction about ten months later at the Mayo Clinic in Rochester, Minnesota. Plaintiff testified that he underwent therapy to strengthen muscles in his hand and to decrease swelling in his right arm.  Plaintiff testified that he underwent physical therapy to strengthen muscles on the repaired shoulder.   Plaintiff introduced into evidence the medical bills associated with his treatment.  Defendants offer no evidence to dispute the treatment procedures that Plaintiff underwent following the accident or the amount paid in medical bills.  After reviewing Plaintiff's medical bills and considering the nature of the accident, the Court finds that Plaintiff's past medical expenses are $326,045.27.   The Court finds this amount was necessary and reasonable for the treatment of Plaintiff's injuries.  Thus, the Court awards Plaintiff $326,045.27 in past medical expenses.[3]

**6.     Future Medical Expenses**

Plaintiff called Lawrence Forman, a vocational rehabilitative expert, to provide testimony regarding Plaintiff's future medical treatment and costs.   Mr. Forman's opinions regarding Plaintiff's future medical treatment and support care were

---

[3] Defendants contend that Plaintiff should not receive damages for past medical expenses because Defendants allege Plaintiff misrepresented certain facts to the state of Florida regarding his employment relationships with USF and MSA in order to receive workers compensation benefits. During the trial, the Court requested that the Defendants provide legal authority to support that contention; Defendants were not able to do so.  Accordingly, the Court denied the Defendants' motion for judgment as a matter of law with respect to Plaintiff's damages for past medical expenses on that ground. As the Court stated during the trial, if there is any issue of alleged misrepresentations made to the Worker's Compensation Board by Plaintiff it is left to the State of Florida's Workers Compensation Board and the Plaintiff to resolve.

speculative and unsupported by the medical testimony and records.   Defendants' expert, Dr. Michael Shahnasarian, provided testimony regarding Plaintiff's future adaptive needs. Dr. Shahnasarian recommended the following adaptive devices for Plaintiff: (a) a soap dispenser (b) rocker knives (c) a spiked cutting board (d) an electric cork screw (e) a discretionary, annual budget for adaptive devices (f) dragon software (g) an adaptive keyboard (h) three vehicular devices (i) a home environmental analysis, and (j) a hand-held shower nozzle.   The Court finds Dr. Shahnasarian's testimony credible.    Dr. Shahnasarian's opinions regarding future adaptive needs total approximately $20,328.03, an amount the Court finds reasonable.

Dr. Kevin Creed, Plaintiff's medical doctor, testified that Plaintiff no longer needs outpatient physical therapy.  Dr. Creed recommends no additional diagnostic studies for Plaintiff.  Dr. Creed indicated that he expects to see Plaintiff about twice a year for office visits.  Dr. Creed testified that his office visits typically cost about $90 per visit.  The Court finds Dr. Creed's testimony credible.  The Court finds that 5 years is a reasonable amount of time for Plaintiff to continue seeing Dr. Creed.  Thus, the Court awards Plaintiff a total of $900 for future office visits.

## III.   CONCLUSION

Accordingly, based on the foregoing, it is hereby **ORDERED** as follows:

1. Defendant ODB is liable, *in rem*, to Plaintiff for **$17,868.15** for the property damage to the Three Graces.  Plaintiff suffered a total of **$1,347,273.30** in damages for the personal injuries he suffered.  Defendant ODB is fully liable, *in rem*, for the damages associated with Plaintiff's injuries.  Thus, plaintiff shall recover a total of $**1,365,141.45** from Defendant ODB in total damages.

Defendant Promenade Shipping is not liable, *in personam*, for any of Plaintiff's damages.

2.   The Clerk is **DIRECTED** to **ENTER** final judgment in favor of Plaintiff in the amount of **$1,365,141.45**.

3.   Plaintiff shall be awarded pre-judgment interest on his past medical expenses ($326,045.27) and on the amount paid to repair property damage to the Three Graces ($17,868.15).  See Reichert v. Chemical Carriers, Inc., 794 F.2d 1557, 1559 (11th Cir. 1986) (pre-judgment interest is only appropriate for past damages). Pre-judgment interest on Plaintiff's past medical expenses shall be calculated from the date the last payment was made (December 22, 2011) until the date judgment is entered.  See Alvarado v. Rice, 614 So. 2d 498, 499 (Fla. 1993).  Pre-judgment interest on the amount paid to repair property damage to the boat shall be calculated from the date of the accident (August 31, 2009) until the date judgment is entered. The pre-judgment interest rate is 3.25%

4.   The Court does not award pre-judgment interest on Plaintiff's damages for pain and suffering as these damages are for injuries suffered over time, not as of a certain date.  See American Dredging Co., v. Lambert, 153 F.3d 1292, 1298 (11th Cir. 1998).

5.   This judgment shall bear post-judgment interest at the rate prescribed by 28 U.S.C. § 1961.

**DONE** and **ORDERED** in Tampa, Florida on this 28th day of August, 2012.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE


Copies furnished to:

All Counsels of Record
Any Unrepresented Parties